## A96A1179. CARR v. THE STATE.
### (476 SE2d 75)

ANDREWS, Judge.

James D. Carr appeals from the judgment entered on a jury verdict finding him guilty of driving a vehicle under the influence of drugs and improper lane usage.

Carr was observed driving a tractor-trailer rig on Interstate 75 weaving aimlessly from lane to lane. After he failed to respond to a Georgia state trooper's efforts to stop him with flashing lights and a siren, two additional state troopers and a Department of Transportation enforcement employee were dispatched in their vehicles to assist in the stop. The four vehicles, with activated lights and sirens, boxed in the moving tractor-trailer, and, while avoiding a collision with the erratically weaving rig, gradually decelerated until Carr finally stopped. Carr was found in the driver's seat unresponsive to the officers, staring straight ahead, his hands tightly gripping the steering wheel. Carr was unable to maintain his balance and had to be assisted by the officers to get out of the rig and walk. The officers testified that, although they did not detect any of the usual signs that Carr was under the influence of alcohol, he clearly appeared to be under the influence of some kind of intoxicant or drug to the extent that he was an unsafe driver. Carr was arrested for driving under the influence and later charged with driving under the influence of certain drugs to the extent that it was less safe for him to drive. OCGA § 40-6-391 (a) (2).

After being read implied consent rights, Carr consented to a State-administered chemical test of his blood for the purpose of determining whether he was under the influence of alcohol or drugs. Thereafter, Carr was taken to a local hospital where blood was with-

drawn from him for the State-administered test. At that time, Carr also had his own independent testing done. The blood withdrawn was analyzed at the State Crime Lab. A forensic toxicologist from the State Crime Lab testified at trial that Carr's blood tested positive for the presence of the drugs carisoprodol and its metabolite, meprobamate, and diazepam and its metabolite, nordiazepam. The toxicologist testified that both carisoprodol and diazepam are prescription drugs with sedative effects and that the unusually high level of carisoprodol found in Carr's blood was enough by itself to have caused Carr's erratic driving and unresponsive demeanor.

1. Carr claims the trial court erred by denying his motion to strike the testimony of the toxicologist as to the results of the State-administered chemical testing of his blood because the State failed to present probative evidence that the person who withdrew his blood for the test was qualified as required under OCGA § 40-6-392 (a) (2).

OCGA § 40-6-392 (a) (2) provides in part that "[w]hen a person shall undergo a chemical test at the request of a law enforcement officer [under OCGA § 40-5-55], only a physician, registered nurse, laboratory technician, emergency medical technician, or other qualified person may withdraw blood for the purpose of determining the alcoholic content therein. . . ." Although the statutory requirement of OCGA § 40-6-392 (a) (2) that blood be withdrawn by a qualified person refers only to testing of blood *for the purpose of determining the alcoholic content . . .*" (emphasis supplied), the testing referred to by the statute is done pursuant to OCGA § 40-5-55 (a), which provides for a driver's implied consent "to a chemical test or tests of his or her blood . . . *for the purpose of determining the presence of alcohol or any other drug. . . .*" (Emphasis supplied.) Construing the two statutes together, we conclude that, since the chemical testing serves the dual purpose of detecting the presence of alcohol or drugs, the statutory requirement that blood used in the testing be withdrawn by a qualified person applies to all blood test results showing drug content as well as alcoholic content. Accordingly, the "qualified person" requirement of OCGA § 40-6-392 (a) (2) applies in this case even though the blood test results showed only drug content rather than alcoholic content.

OCGA § 40-6-392 establishes mandatory requirements for the admission of chemical blood test results in criminal cases arising out of violations of OCGA § 40-6-391 in which such violations are an essential element of the charged offense. *Harden v. State*, 210 Ga. App. 673, 674 (436 SE2d 756) (1993); *Munda v. State*, 172 Ga. App. 857, 858 (324 SE2d 799) (1984). Thus, when the State seeks to prove the charged offense by using evidence of the chemical test results, it must show compliance with the statutory requirements. *Harden*, supra. In this case, as to the requirement that blood be withdrawn by

a qualified person, the State neither produced the person who withdrew the blood to establish his or her qualifications under OCGA § 40-6-392 (a) (2), nor did it establish that such person was qualified by producing a certificate from the Secretary of State or the Department of Human Resources as provided by OCGA § 40-6-392 (e). The only evidence produced by the State to prove this requirement was testimony from a state trooper that a nurse withdrew the blood. Because the trooper's testimony was clearly non-probative hearsay, the State failed to present any competent evidence to prove compliance with the requirements of OCGA § 40-6-392 (a) (2). *Harden,* supra at 675.

Nevertheless, when the State introduced the testimony of the toxicologist as to the results of the blood test, Carr made no objection. Instead, Carr waited until after the State rested its case and then moved to strike the toxicologist's testimony on the basis that the State failed to prove the blood was withdrawn by a person qualified under OCGA § 40-6-392 (a) (2). By failing to object when the testimony was offered, Carr waived any objection which he could have made. "It is well settled in this state that it is too late to urge objections to the admission of evidence after it has been admitted without objection." (Citations and punctuation omitted.) *Henderson v. State,* 162 Ga. App. 320, 323 (292 SE2d 77) (1982). Although a party may move to strike *illegal evidence* any time before the case goes to the jury, even where no objection was made when it was admitted (see *Mable v. State,* 261 Ga. 379, 380-381 (405 SE2d 48) (1991)), the result of the blood test admitted in this case, without objection, despite the State's failure to satisfy the foundational requirement that the blood was withdrawn by a person qualified under OCGA § 40-6-392 (a) (2), was not illegal evidence subject to a subsequent motion to strike. *Corley v. State,* 192 Ga. App. 35, 36 (383 SE2d 586) (1989).

There was no challenge to the validity of the blood test results. Although the State's failure to lay a proper foundation by proving the blood was withdrawn by a person qualified under OCGA § 40-6-392 (a) (2) affected the admissibility of the test results, there was no evidence that the probative value of the test was in any way affected. "[A] distinction is to be drawn between illegal testimony and secondary evidence or other evidence which is legal in itself because it is of probative value but is inadmissible until the proper foundation for its reception has been laid." *Patton v. Bank of LaFayette,* 124 Ga. 965, 974 (53 SE 664) (1905). The testimony regarding the blood test results was of probative value and was not illegally admitted. *Henderson,* supra at 322-323, 328-329. The trial court did not err by denying Carr's motion to strike the testimony.

2. The evidence was sufficient to support the jury's guilty verdict as to both offenses. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61

LE2d 560) (1979).

*Judgment affirmed. Pope, P. J., and Smith, J., concur.*

DECIDED SEPTEMBER 17, 1996.

*Ralph M. Hinman III*, for appellant.

*Kermit N. McManus, District Attorney, Forest L. Miles, Assistant District Attorney*, for appellee.